Contract of Sale for New York office, commercial and multi-family residential premises

## Contract of Sale—Office, Commercial and Multi-Family Residential Premises

### Table of Contents

Schedule A.  Description of premises (to be attached)
Schedule B.  Permitted exceptions
Schedule C.  Purchase price
Schedule D.  Miscellaneous
Schedule E. Rent schedule (to be attached)
Section 1.   Sale of premises and acceptable title
Section 2.   Purchase price, acceptable funds, existing mortgages, purchase money mortgage and escrow of downpayment
Section 3.   The closing
Section 4.   Representations and warranties of seller
Section 5.   Acknowledgements of purchaser
Section 6.   Seller's obligations as to leases
Section 7.   Responsibility for violations

Section 8.   Destruction, damage or condemnation
Section 9.   Covenants of seller
Section 10. Seller's closing obligations
Section 11. Purchaser's closing obligations
Section 12. Apportionments
Section 13. Objections to title, failure of seller or purchaser to perform and
Section 14. Broker
Section 15. Notices
Section 16. Limitations on survival of representations, warranties, covenants and other obligations
Section 17. Miscellaneous provisions
Signatures and receipt by escrowee

CONTRACT dated *April 4,* 2005

between

358 BROADWAY LLC
c/o Brill & Meisel
845 Third Avenue
New York, New York 10022
Attn: Mark N. Axinn, Esq.

("Seller") and *358 BROADWAY-FRANKLIN ACQUISITION, LLC*

c/o Alter Mantell, LLP
90 Park Avenue
New York, New York 10016
Attn:  Irving D. Alter, Esq.

("Purchaser"),

Seller and Purchaser hereby covenant and agree as follows:

### Schedule A
### DESCRIPTION OF PREMISES

The Premises are located at or known as  358 Broadway, New York, New York
*a/k/a 59 Franklin Street*

Tax Map Designation:
Section:  , Block: 171  , Lot: 5

[X] (metes and bounds description attached hereto)

### Schedule B
### PERMITTED EXCEPTIONS

1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title unmarketable.

2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. The Existing Mortgage(s) and financing statements, assignments of leases and rents, collateral assignments, ancillary thereto *annexed hereto as Exhibit B.*

4. Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this contract.

5. Unpaid installments of assessments not due and payable on or before the Closing Date.

6. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants, *provided Purchaser's title company will omit same*

7. (a) Rights of utility companies to lay, maintain install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises. *and all easements and agreements of record relating thereto as of the date hereof.*

(b) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and *minor* encroachments of similar elements projecting from adjoining property over the Premises.

(c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto:

Survey made by Earl B. Lovell, Inc., dated 6/5/40 and survey for location of possession along the westerly line made by Earl B. Lovell-S.P. Belcher, Inc., dated 10/29/65, both of which were last re-drawn by visual examination made by Harwood Surveying, P.C., dated 8/15/2003. *-as of the date hereof*

(e) Covenants, consents, restrictions, agreements, consents, and other agreements, if any, of record, provided they do not ~~prevent~~ *interfere with* the continued use and maintenance of the Premises *or conversion thereof to Condominiums.*

(f) Minor variations, if any, between tax lot and property lines.

(g) Standard forms and provisions contained in ALTA form employed by the title insurer *which are not permitted by law to be removed*

(h) ~~All violations of laws, ordinances, orders, rules, regulations noted or issued by any governmental office, department or authority, whether before, on or after the date hereof.~~

Schedule C
PURCHASE PRICE

The Purchase Price shall be paid as follows:

(a) By check subject to collection, the receipt of which is hereby acknowledged by Seller *~~at closing~~   $ 2,000,000.00 *
(b) By check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02: $ 15,500,000.00
(c) By acceptance of title subject to the following Existing Mortgage(s):   $ -0-
(d) By execution and delivery to Seller by Purchaser or its assignee of a note secured by a Purchase Money Mortgage on the Premises, in the sum of   $ -0-
payable as follows:

Making for a total Purchase Price of:   $ 17,500,000.00

Schedule D
MISCELLANEOUS

1. Title insurer designated by the parties (§1.02):  ~~The Judicial Title Insurance Co.~~ *New York Land Services*

2. Last date for consent by Existing Mortgagee(s) (§2.03(b)): N/A

3. Maximum Interest Rate of any Refinanced Mortgage (§2.04(b)): N/A

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(c)): N/A

5. Seller's tax identification number(s) (§2.05)  13-3993612

6. Purchaser's tax identification number(s) (§2.05):

7. Scheduled time and date of Closing (§3.01):  April 30, 2007 at 10:00 a.m.

8. Place of Closing (§3.01): 845 Third Avenue, 16th Floor, New York, New York *or office of Purchaser's lender or such lender's counsel in New York City.*

9. Assessed valuation of Premises (§4.10): $1,512,000.00

10. Fiscal year and annual real estate taxes on Premises (§4.10):  2004/05; $119,833.32

11. Tax abatements or exemptions affecting Premises (§4.10):  NONE

12. Assessments on Premises (§4.13):  ~~N/A~~ *NONE*

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02): $50,000.00

14. Maximum Expense of Seller to cure title defects, etc. (§13.02): $~~40~~50,000.00

15. Broker, if any (§14.01):  NONE

16. Party to pay broker's commission (§14.01):  NONE

17. Address for notices (§15.01):
If to Seller:
c/o Joel Rosen, CPA, P.C.
7 Penn Plaza, Suite 222
New York, New York 10001  *Fax: 212-695-7402*
with a copy to:
Mark N. Axinn, Esq.
Brill & Meisel
845 Third Avenue, New York, New York 10022  *Fax: 212-753-7373*
If to Purchaser:
*c/o ACG Equities LLC*
*1579 50th Street*
*Brooklyn, NY 11219  Fax: 718-437-2528*
with a copy to:
Irving D. Alter, Esq.
Alter Mantel, LLP
90 Park Avenue, New York, New York 10016  *Fax: 212-953-5061*

18. Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01):

19. Additional Schedules or Riders (§17.07):

Schedule E
RENT SCHEDULE

(☒ if checked, annexed hereto)

*The downpayment shall be payable in two installments of $1,000,000.00 each ₂ pursuant to paragraph 21 of the Contract.*

*Receipt of the first installment payment of $1,000,000.00 is hereby acknowledged:*

*Brill + Meisel*

*By: _____*
*Partner*

*[handwritten: together w/ all improvements + ...]*

**Section 1. Sale of Premises and Acceptable Title**

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract:

(a) the parcel of land more particularly described in Schedule A attached hereto ("Land");

(b) all buildings and improvements situated on the Land (collectively, "Building");

(c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

(d) all appurtenances and all the estate and rights of Seller in and to the Land and Building; and

(e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as

*[handwritten left margin: as the title insurer will insure at standard rates]*

**358 Broadway, New York, New York**

Tax Map Designation:
Section: ___ , Block: **171** , Lot **5**

*[handwritten: accept]*

*[handwritten: Such marketable]*

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to:

(a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and

(b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any member of the New York Board of Title Underwriters) shall be willing, without special premium, to omit as exceptions to coverage, or to except with an affirmative insurance against collection out of or enforcement against the Premises and shall be accepted by any lender described in Section 2.03.2 of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

**Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage and Escrow of Downpayment**

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is **$17,500,000.00**

§2.02. All monies payable under this contract, unless otherwise specified in this contract, shall be paid by

(a) certified checks of Purchaser or any person making a purchase from Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or

(b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of 1/20th of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing, *[handwritten: or at Purchaser's election by wire transfer of federal funds.]*

§2.03. (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required thereunder prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

(b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent

(i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or

(ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02.

If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02 if any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).

§2.04. (a) If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the standard forms of the New York Board of Title Underwriters then in effect for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefor and the filing fees for any financing statements delivered in connection therewith.

(b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii) if the principal amount of the Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due thereunder in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagee to confirm such subordination.

(c) The Purchase Money Mortgage shall contain the following additional provisions:

3

(i) "The mortgagee or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert the day following the last day of the fiscal year of this mortgage in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], on not less than 10 days' written notice to the holder hereof."

(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii) "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagor, if other than one of the institutions listed in Section 274-a agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv) "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in the provisions hereof."

(v) The additional provisions, if any, specified in rider hereto.

§2.05. (a) If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee ~~shall~~ hold such proceeds in an interest-bearing account, ~~but~~ if any interest is earned thereon, ~~such interest~~ shall be paid to ~~the party entitled to the escrowed~~ proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

**Section 3. The Closing**

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

**Section 4. Representations and Warranties of Seller**

§4.01. Seller represents and warrants to Purchaser *the following all of which shall be true and correct as of the date hereof and as of the closing date and which shall survive for one (1) year:*

§4.01. Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02. If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the original and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended ~~except as otherwise set forth therein~~.

§4.03. The information concerning written leases (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein ~~and any~~ other ~~Tenancies~~. Except as otherwise set forth in the Rent Schedule ~~or elsewhere in this contract~~,

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no renewal or extension options have been granted to tenants;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current basis and there are no arrearages in excess of one month; *

(e) no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

2A

*As of the date of this Contract*

---

\* except for the store tenant, RJH Fashion Corp. which is paying the sum of $9,000.00 per month which sum Seller is accepting as full payment of all rent and additional rent due from such tenant;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board for an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatement as senior citizens, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that have not been complied with by Seller.

§4.06. If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affecting coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, *the representation in respect thereto such certificate and ~~is annexed hereto as Exhibit B~~

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by

Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

### Section 5. Acknowledgments of Purchaser

Purchaser acknowledges that:    *Subject to the One Diligence Period*

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

### Section 6. Seller's Obligations as to Leases

§6.01. Unless otherwise provided in a schedule attached to this ~~contract~~, *the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld:

(a) amend, renew or extend any Lease in any respect, unless required by law; ¹

(b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or

(c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder.

§6.02.   *Subject to paragraph 25 hereof*  Unless otherwise provided in a schedule attached to this ~~contract~~, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant, without first giving Purchaser written notice of the identity of the proposed tenant, together with

(a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and

(b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §7.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to put the premises in the tenant's

---

³ℬ

*or if required by law, between

occupancy of Reletting Expenses ), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.02, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof.

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that no vacancy with not permitted by creating by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent authorizations for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease of Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser to an abatement of or credit against the Purchaser Price or give rise to any other claim on the part of Purchaser.

## Section 7. Responsibility for Violations

§7.01. Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior, in the date <u>Closing</u> of any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect and complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if

(a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or

(b) the Building is a multiple-dwelling and either

(i) such violation is a rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or

(ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law, it there exists no notice violations noted or issued on or after the date of this contract shall be in the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure

to remove or fully comply with the following, violations shall not be an objection to title:

(a) any violations of New York City Local Law 5 of 1973, as amended (relating to fire safety in office buildings), if applicable, or

(b) any violations which a tenant is required to remove or comply with pursuant to the terms of a lease by reason of such tenant's use or occupancy. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's Institutional Lender reasonably refuses to provide financing by reason of the violations described in (a) above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

## Section 8. Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

## Section 9. Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01. The existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).

§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless same is terminable without penalty by the then owner of the Premises upon not more than 30 days notice.

§9.03. If the insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises; the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

## Section 10. Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§10.01. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly

4

* In the event of any damage to the property and cost to repair is under $250,000, Seller will assign insurance proceeds and pay deductible to Purchaser and Purchaser closes w/o abatement to this P.P. If cost is over $250,000, Purchaser can (x) terminate or (y) accept assignment of ins proceeds plus deductible from Seller and close w/o abatement to Purchase Price.

executed in proper form for recording so as in convey the title required by this contract.

§10.02. All Leases initialed by Purchaser and all others in Seller's possession.

§10.03. A schedule of all cash security deposits and a check or credit to Purchaser in the amount of such security deposits, including any interest thereon, held by Seller on the Closing Date under the Leases ~~and if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments~~ which are either then outstanding ~~and any lease securities which are other than cash~~.

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06. An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, ~~licenses~~ policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

§10.07. (a) Written consent of the Mortgagee(s), if required under §2.00(h), and(b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s).

Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.

§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).

§10.09. All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true ~~and genuine certificates thereof~~.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12. Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

§10.13. To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

§10.14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

(10.15 Notice(s) to the Mortgage, (s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish ~~compliance with such law~~.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Any other documents required by this contract to be delivered by Seller.

10.19 FIRPTA Certification

Section 11. Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01. Deliver to Seller check/s in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, ~~plus the amount of escrow deposits, if any, assigned pursuant to §10.08~~. *or wire transfer of Federal funds*

~~§11.02. Deliver to Purchaser the Purchaser money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all property executed, and Purchaser shall pay the Mortgage recording tax and recording fees for any Purchase Money Mortgage.~~

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

Section 12. Apportionments

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) prepaid rents and Additional Rents (as defined in §12.03);

~~(b) interest on the Existing Mortgage(s);~~

(c) real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(f) charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g) permitted administrative charges, if any, on tenants' security deposits;

(h) dues to rent stabilization associations, if any;

(i) ~~insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;~~

5

Case 1:07-cv-05850-CM

(j) Reletting Expenses under §16.02, if any; and

(k) any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be reprovincial. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority:

(a) first to the month preceding the month in which the Closing occurred;

(b) then to the month in which the Closing occurred;

(c) then to any month or months following the month in which the Closing occurred; and

(d) then to the month preceding the month in which the Closing occurred.

If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

### Section 13. Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled in a reasonable adjournment or adjournments of the Closing for up to 100 days ~~and till the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first~~ to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract for any reason Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the cost of a new survey if there was no existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the

parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off of the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgages, of which Seller has actual knowledge.

§13.03. Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §22.02. ~~If Purchaser's title insurance company~~ is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such further or additional or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. *actual damages as such event being difficult or not impossible to ascertain*

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

### Section 14. Broker

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have any dealing in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

6

or by facsimile transmission or recognized overnight carrier

Section 15. Notices

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, (or as Seller or Purchaser shall otherwise have given notice as herein provided.

Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action been thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in [illegible] shall survive until the Limitation Date specified in Schedule D (or if none is so specified, the Limitation Date shall be the date which is [this Agreement] [one (1) year] after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.

§16.02 The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

Section 17. Miscellaneous Provisions

§17.01. If consent of the Existing Mortgagee(s) is required under §3.03(b), Purchaser shall [may] assign this contract or its rights hereunder without the prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the

assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

SEE RIDERS ANNEXED HERETO AND MADE A PART HEREOF
IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

PURCHASER(S):                                    SELLER(S):

358 BROADWAY-                              358 BROADWAY LLC
FRANKLIN ACQUISITIONS LLC

By: [signature]                              By: [signature]
    Member

_____                   _____


_____                   _____


Receipt by Escrowee

The undersigned Escrowee hereby acknowledges receipt of, by check subject to collection, to be held in escrow pursuant to §2.05.

By: _____

7

**FIRST RIDER ANNEXED HERETO AND FORMING PART
OF CONTRACT OF SALE BETWEEN
358 BROADWAY LLC, AS SELLER, AND
358 BROADWAY-FRANKLIN ACQUISITION LLC
PURCHASER, AFFECTING
PREMISES LOCATED AT 358 BROADWAY
NEW YORK, NEW YORK**

18.     Conflict. In the event of any conflict between provisions contained in this Rider and those in the printed form to which it is annexed, the provisions of this Rider shall control.

19.     Closing Date. The Closing may be held on any date before September 30, 2005 or after May 1, 2006 and on or before April 30, 2007 ("Final Closing Date") WITH TIME BEING OF THE ESSENCE AS TO THE FINAL CLOSING DATE, upon thirty (30) days' written notice from Purchaser to Seller. Notwithstanding the foregoing, (1) the parties shall have the right but not the obligation to agree to an earlier closing date should they be so inclined, (2) Purchaser shall be permitted one or more adjournments of the Closing Date not to exceed thirty (30) days in the aggregate, and (3) if Purchaser elects to close between January 1 and April 30, 2006, Purchaser shall reimburse Seller one-half of the pre-payment penalty that Seller must pay its Lender, not to exceed the sum of $31,250.00.

20.     Authorization of Attorneys.

The respective attorneys for the parties are hereby authorized to give any notice which the party is required to give or may give under this Contract.

21.     Downpayment. Notwithstanding any language to the contrary in Schedule C hereof, the Downpayment may be paid in two installments, each of One Million ($1,000,000.00) Dollars, with the first installment thereof ("Initial Downpayment") due upon execution of this Contract and the second installment due thirty (30) days thereafter (i.e. on May 4, 2005). The Downpayment shall be held by Seller's attorneys in a segregated interest-bearing account with all interest earned thereon belonging to Seller, except in the event of Seller's willful default such interest shall go to Purchaser.

22.     Seller's Execution.

This Contract shall not be binding upon Seller, and Seller shall incur no obligations of any kind to Purchaser, unless and until a fully executed counterpart of this Contract is delivered to Purchaser's attorney and the Downpayment set forth in Schedule C and Paragraph 21 of this Contract has been deposited and cleared.

23.     Due Diligence Period. Purchaser shall be afforded up to thirty (30) days after payment of the Initial Downpayment (i.e. May 4, 2005) ("Due Diligence Period"), to inspect the Premises and all filings and reports with respect thereto. At any time during such Due Diligence Period, Purchaser shall have the right cancel this Contract upon written notice and to receive a refund of the entire Initial Downpayment. In the event Purchaser so elects to cancel this Contract during the Due Diligence Period or if Purchaser does not give Seller written notice of its intention to go forward with this Contract and does not deliver to Seller's attorney the second $1,000,000.00 downpayment, Purchaser will be deemed to have terminated this Contract and Seller's sole obligation shall be to refund the Initial Downpayment to Purchaser after which this Contract will be deemed null and void and of no further force and effect.

8

24. <u>Tax Free Exchange.</u>

Seller shall have the right at its option to transfer and convey the Property to Purchaser as part of a tax free exchange ("Exchange") for other real property or properties of like kind ("Exchange Property") pursuant to Section 1031 of the Internal Revenue Code in lieu of selling the Property to Purchaser as otherwise provided in this Contract. If Seller so elects by written notice to Purchaser prior to Closing, Purchaser agrees to cooperate with Seller to effectuate the Exchange, provided that Purchaser is not required to incur any additional expense or liability in connection therewith.

25. <u>Tenancies.</u>

(a)      If any tenants fail to comply with their obligations under their leases or tenancies prior to the Closing Date, Seller may enforce its rights by terminating their leases by summary proceeding or otherwise, and Purchaser shall accept the Premises with or without such leases being in effect as the case may be.

(b)      Seller does not represent that the leases or tenancies affecting the Premises on the date of the Contract will be in effect on the Closing Date. It is agreed and understood that no representation has been made and no responsibility is assumed by Seller with respect to the continued occupancy of any portion of the Premises by any tenant prior to the Closing Date, whether by summary proceedings or otherwise, shall not give rise to any claim on the part of Purchaser or affect this Contract in any manner whatsoever.

(c)      Purchaser acknowledges that certain of the leases may expire or otherwise terminate between the execution of this Contract and the Closing Date and has requested that Seller not extend or renew such leases if not required to do so by law. Seller agrees not to extend or renew any such leases providing that Purchaser:

(1)      Pay to Seller within ten (10) days after transmittal of rent bill by fax or mail addressed to Purchaser any and all rents and additional rent which would have come due from any tenant during the prior calendar quarter whose lease has been terminated or has not been renewed or extended from the date of termination or expiration thereof until the Closing Date. Notwithstanding the foregoing, in the event of Seller's willful default, Seller shall reimburse Purchaser any sums paid hereunder;

(2)      The last monthly rent due under an expired or terminated lease plus four (4%) percent increases per annum effective with the renewal date shall be prima facie evidence of the amount to be paid on a monthly basis by Purchaser from the Rent Shortfall Escrow except where a <u>bona fide</u> offer to rent vacant space has been received by Seller but not accepted at Purchaser's request, such shall be the amount due from the Rent Shortfall Escrow, net of the costs that would have been associated with such new lease or renewal; and

(3)      Purchaser acknowledges and agrees that Seller did not lease Unit 6D for which a <u>bona fide</u> offer of $4,300.00 per month commencing April 1, 2005 was made but not accepted by Seller at Purchaser's request.

(d)      The parties acknowledge that Seller shall continue to manage the Building until the Closing Date. Notwithstanding the foregoing, Seller agrees to use its best efforts to assist Purchaser in connection with any negotiations Purchaser wishes to enter into with any tenant in the Building provided that (1) no such negotiation shall take place without the participation and approval of Seller not to be unreasonably withheld or delayed, and (2) no such

negotiation shall take place before Purchaser deposits with Seller's attorney the second $1,000,000.00 downpayment hereunder.

26.    Exculpation of Seller.  It is understood and agreed that the obligations of Seller under or with respect to this Contract, and with respect to any instruments or documents delivered in performance of Seller's obligation hereunder, shall not constitute personal obligations of Seller or of any of its members or managers, and Purchaser will look solely to the Premises for satisfaction of any obligation or liability of Seller in respect to this Contract.

**358 BROADWAY LLC**

By: _____
    Jerry Jacobs, Member

Purchaser:

**358 BROADWAY-FRANKLIN ACQUISITION LLC**

By: _____
    Henry Kauftheil, Member

SECOND RIDER ATTACHED TO AND MADE A PART OF CONTRACT BETWEEN

358 BROADWAY LLC

("Seller") and

## 358 BROADWAY-FRANKLIN ACQUISITION, LLC

a/k/a 54 Franklin street

("Purchaser"),concerning the Premises are located at or known as 358 Broadway, New York, New York

Tax Map Designation:
Section:    , Block:   171   , Lot:   5
   ("Premises").

1.    The Purchaser shall take the premises subject to the following:

(a) Any state of facts an accurate survey may show, provided such facts do not render title unmarketable.

(b) Covenants, restrictions, easements and consents of record, provided they do not prohibit the erection or maintenance of the structures now on the premises.

(c) Party wall and party wall agreements, if any.

(d) Existing tenancies and lease as set forth upon the annexed schedule, which leases have been exhibited to the Purchaser(s) and Purchaser(s) attorneys.

(e) Possible lack of right to maintain vault area under and coal chutes in the sidewalk.

(f) Possible encroachments of retaining walls, bay windows, balconies, copings, cellar doors, sidewalk elevators, fences and fire escapes, and variations between record lines, and fences and retaining walls.

(g) Rights, if any acquired by any utility company to maintain and operate lines, wires, cables, poles and distribution boxes in, over and upon said premises.

(h) Variations between description herein and tax map description.

2.    If any past due rentals are owing by tenants at the time of closing of title for a period not exceeding one month and the Seller is entitled to all or part of the said past due rentals, the Purchaser agrees that the first monies received shall be held by the Purchaser as trustee for the Seller on account or in payment of such past due rentals and the Purchaser agrees to remit forthwith to the Seller the amount of such past due rentals to which the Seller is entitled, so collected, out of the first monies received by the Purchaser.

3.    The Seller agrees to credit to the Purchaser upon the closing of title (where not

premises by the terms of a lease), so much of the securities as indicated under leases, upon the execution by the Purchaser of an agreement indemnifying the Seller against any claim that may be made by the tenants in connection with the securities transferred to Purchaser.

4.    The Seller makes no representation and assures no responsibility with respect to the continued occupancy of said premises or any part thereof by any tenant or tenants now in possession. The removal of the tenants, whether by summary proceeding or otherwise prior to the delivery of the deed, shall not give rise to any claim on the part of the Purchaser or affect this agreement in any manner whatsoever. Seller, prior to closing of title, shall be entitled but not obligated to enforce the rights under any lease or any tenancy by summary proceedings. Seller agrees to operate the building in a businesslike manner.

5.    The existence of mortgages, liens or encumbrances shall not be objections to title, or encumbrances shall not be objections in title, provided that properly executed instruments in recordable form necessary to satisfy same are delivered to the Purchaser at the closing of title together with recording and filing fees, if any, and such mortgage, liens or encumbrances may be paid out of the cash consideration paid by the Purchaser and the title company omits. Notwithstanding the provisions herein, the existence of any violations against the premises shall not be deemed an objection to title provided the seller certifies that it has complied with such violation. Any violation which a tenant is required to remove or comply with pursuant to terms of lease or otherwise, shall not be deemed a failure to comply with such violations. In the event the aggregate reasonable cost of complying with violations (not certified as complied with by seller) shall exceed the sum of $5,000, seller shall have the option of complying with such violation(s) or refusing to comply therewith. In the event the seller refused to comply therewith, purchaser shall have the option of taking title subject to such violations and receiving an abatement of the purchase price for the reasonable cost of complying with such violations, such abatement, however, not to exceed the sum of $5000, in the aggregate; or the purchaser may refuse to take title and rescind this contract pursuant to the terms of this contract.

II

6.   Unpaid liens for taxes, water charges and assessments shall not be objections to title, but the amount thereof, plus interest and penalties thereon shall be deducted from the consideration to be paid hereunder, and allowed to the Purchaser, subject to the provisions for apportionment of taxes and water charges contained herein and title company assures against collection.

7.   Unpaid franchise tax or any corporation in the chain of title shall be no objection to title, provided the Seller deposits with the Purchaser's title company in escrow a reasonable amount to secure the payment of such unpaid franchise tax within sixty days from the date of closing of title.

8.   Fuel on the premises on the date as of which adjustments shall be made, shall be paid for by the Purchaser, in cash or certified check or via adjustments, at the time of closing of title, at the cost thereof to the Seller, plus tax. The amount of fuel is to be estimated in writing by a fuel company for the Seller.

9.   The Seller has not made and does not make any representations as to the physical condition, income, expense, operation or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that no such representations have been made. Purchaser has examined and investigated to its full satisfaction the nature and condition of the real property hereby agreed to be sold and agrees to accept the same "AS IS". Purchaser, in executing this agreement and in undertaking to perform and in performing the same, does not rely upon any statements, representations or information by whomsoever made, whether verbal or written statements, representations by real estate brokers' "set-ups" or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person unless the same are specifically set forth herein. This contract sets forth the entire agreement of the parties hereto. The acceptance and delivery of the deed of conveyance at the time of closing of title shall/be deemed to be full performance and discharge of any and all of the obligations on the part of the seller to be performed on his part pursuant to the terms and provisions of the contract, except as to those obligations which are specifically stated to survive the delivery of the deed.

10.   If, for any reason whatsoever, the Seller shall be unable to convey a marketable title upon the terms and conditions herein set forth, or be unable to comply with the commitments of the Seller as herein set forth, the Seller, at its option, shall be entitled to reasonable adjournments for the purpose of curing any defects in title or effecting compliance with any of the commitments of the Seller, and if the Seller (who is under no obligation to bring any action or proceeding or otherwise incur any expense whatsoever to cure such defect) is unable to cure such defect within an adjournment period, or if no adjournment is requested by the Seller, the Purchaser shall, at his election, have the right to purchase the property subject to such defect and pay the full consideration thereof without any claim on the part of the Purchaser for abatement, or the Purchaser shall have the right to rescind this contract, upon which rescission pursuant to this paragraph, the sole liability of the Seller will be to refund to the Purchaser the amount paid on account of the purchase price and to

pay the net cost of examining the title, which cost in not to exceed the charges fixed by the New York State Board of Title Underwriters, and upon such refund this contract shall be null and void, Seller will not suffer or permit any liens to be created between this date and closing except as may be permitted hereunder.

11.   If, between the date hereof and the date of closing of title, any unit in the premises becomes vacant, the Seller shall have the right to rent or lease same for a period not exceeding two years, at the maximum rental permitted by applicable real law or regulation or at the rental above herein if the unit is decontrolled. If paid by the Seller, the cost of painting, decorating and furnishing any equipment in such unit shall be pro-rated and paid for by the Purchaser in cash at the time of closing of title. Privilege is hereby given to the Purchaser, however, to require that the Seller keep any such unit vacant in which event and upon the closing of title, the Purchaser shall pay to the Seller in cash, the Seller's portion of the rent as shown herein for any such unit, adjusted as of the date when such unit became vacant, such privilege shall be exercised within three days after notice by Seller to Purchaser by registered or certified mail.

12.   The parties mutually agree that any right, title and interest of the Seller in and to any and all personal property which may be in or upon the premises appurtenant to or used in connection with the operation thereof and owned by the Seller, shall be deemed transferred or conveyed to the Purchaser under the deed of conveyance to be delivered, but that no part of the purchase price shall be deemed to have been paid by the Purchaser for same.

13.   The Purchaser, at least ten (10) days prior to the closing of title, shall furnish to Seller's attorney a written notice of any objections to title.

14.   The acceptance of the deed by the Purchaser herein or assigns shall be deemed full compliance by the Seller of all the terms, covenants and conditions of this agreement on the part of the Seller to be performed, and no claims against the Seller shall survive the closing of title except as otherwise expressly stated herein.

15.   The sum deposited by the Purchaser hereunder as down payment whether made at the time of execution of this contract or at time hereafter whether required hereunder or agreed to hereafter, shall in the event of default by the Purchaser be retained by the Seller as liquidated damages, and neither party shall have any further obligations against the other.

16.   If the payment made on account of the purchase price at the time of execution of this contract be by check, and if said check shall fail of collection in due course, Seller, at its option, may declare this contract null and void, Seller may also assess a bounce fee of $ 100.00.

17.   The following additional items are to be apportioned: superintendent's salary.

18.   If any provision of this Rider shall conflict with any printed provision of this Agreement, the provision of the Rider shall control.

12

19. Any and all of the subject provisions contained in this contract may be omitted by the Seller in the deed to be delivered hereunder, but all such provisions as omitted shall survive the delivery of said deed or deed.

20. ~~This contract is not assignable except that purchaser shall have the right to assign the within contract to a corporation to be organized by him in which he is the majority stockholder. Purchaser shall notify Seller in writing of such assignment upon receipt of which such assignment shall be effective and without SELLER'S consent.~~

21. Notwithstanding anything to the contrary contained herein, the parties agree that any changes or additions on the within Contract may be initiated by the respective attorneys for the parties with the same force and effect as if initiated by the parties.

22. The Seller represents that the rents listed on the annexed schedule are currently being billed to each of the tenants for the month in which the Contract is dated. All leases expire as per rent schedule annexed. This paragraph survives closing.

23. ~~The Seller represents that it has~~ received no notice of any applications or protests with reference to any rentals set forth on the annexed rent roll filed with any rental authority or administration; that no tenant has been given any further concession or consideration for the rental of any space; and further, that no utilities except smoking gas are included in any rent, except the superintendent, and there are no professional or furnished apartments. This paragraph survives closing.

24. Seller represents that the premises are legal for occupancy by families as per annexed Certificate of Occupancy and seller will deliver a Certificate of Occupancy for same at closing of title.

25. ~~The Seller represents that it has~~ filed the registration required in accordance with the New York State Division of Housing and Community Renewal as required by the Omnibus Housing Act of 1983. This paragraph survives closing and Seller has complied with all applicable regulations of said act since said date.

26. That in all cases where rents have been increased by reason of additional service or equipment, that same have actually been furnished, installed and fully paid for and that none of the rentals reflect or include a sum allowed for increased occupancy or wholesaling.

27. The Seller represents that each apartment is equipped with one stove and one refrigerator owned by the Seller and included in this sale.

28. The Seller will provide to the Purchaser at the time of closing of title an affidavit stating that no work has been done upon the premises by the City where the premises are located and that the City of has not demanded that any work by performed which would result in charge by the City of Emergency Repair Service nor is there any unpaid charge for Emergency Repair Service.

29. It is agreed that no party, other than the named Purchaser, shall be liable hereunder as disclosed or undisclosed principal.

30. ~~The Seller represents that at no~~ time during the year last past there has been an Article 7A proceeding affecting the premises and, additionally, as a condition of closing, no Article 7A proceeding will be pending and no rent strike will be in effect.

31. The Seller represents to the best of its knowledge, that it has complied with any ordinance or code affecting the premises as to the installation of window guards in apartments in which young children reside. However, this is not intended in any basis for purchaser not closing and is merely intended for information purposes.

32. At the closing of title hereunder, Seller will deliver to the Purchaser any and all tenant files, credit reports and other documents and papers relating to residential and commercial occupants in the premises.

33. ~~The Seller represents that the~~ residential rents listed on the annexed schedule have been registered pursuant to the E.T.P.A., as amended and that it is a member in good standing of the Rent Stabilization Association. Seller represents that it will deliver all certificates and registrations filed for the premises at closing of title; that the said rents do not exceed those permitted under present law; further, that there are no applications, orders, protests or complaints with reference to any of said rentals or services or equipment pending with any rental authority or administration or any Court; further, that since the said registrations there have been no distinctions of services and equipment and none will be suffered by the Seller until the closing date; and further, that no tenant has been given any concession or consideration for the rental of any space; and further, that none of the apartments are rented furnished or for professional purposes.

A variance between the total monthly rental as set forth in the annexed rent roll and that which may be certified by the appropriate agency, shall not be cause for rejection of title or reduction of purchase price, provided such variance shall not exceed a total of $ per month. In the event such variance shall exceed said total sum per month, the purchaser may either

(a) accept the deed in the above premises without any abatement or reduction in the purchase price and without any claim of any kind or nature in law, or in equity, against the seller or

(b) the purchaser may rescind this contract pursuant to the terms contained herein.

34. If there are any complaints or proceedings pending for the reduction of any of the rentals and if any are filed prior to closing of title, the Seller will comply with and discharge same prior to closing at the Seller's own cost and expense; and if said complaints or proceedings are not discharged by the Seller, the Seller is to give to the Purchaser a credit for the cost of such discharge of complaints or proceedings at the closing of title. Seller shall be responsible for any rent rollbacks or refunds for the ~~period prior to the closing of title.~~

35. That none of the tenants has any lease or agreement conferring any rights or estate in the premises and that there are no claims,

counterclaims or offsets by any tenant, except as indicated on the rent schedule, and that said leases or agreements, if any, expire as indicated on said rent schedule are presently in full force and effect without any modification. Wherever on said schedule there is no indication of a lease, the tenant is a statutory or monthly tenant; further, that any and all leases in existence which have not been exhibited, contain no unusual clauses and all leases contain agreements fully subordinating them to any existing or future mortgage or mortgages in any amounts and on any terms.

36.     All securities which may have been received by Seller or predecessor in interest, with regard to any tenant on the premises, together with accrued interest, shall be turned over to the Purchaser on the closing, and the Purchaser shall sign an agreement holding the Seller free from any liability in reference to the securities delivered to the Purchaser. The Seller agrees not to release or return any such securities in whole or in part.

37.     Seller represents that any repairs or alterations or equipment to be furnished pursuant to the terms of any lease or mortgage agreement will be done or supplied by Seller at Seller's own cost before closing. That no demand has been made by any mortgagee nor insurance company requiring any work to be done on the premises or for additional fire insurance. The Seller agrees to maintain the premises in their present order and repair and to make any and all repairs or replacements until closing so as to deliver up the premises in substantially their present condition, usual wear and tear excepted.

38.     The Seller represents that there are no union contracts or service contracts and that Seller has had no communications during its ownership from any labor unions, nor will it enter into any negotiations or execute any contract with a labor union between contract and closing, nor has it paid any sums of money to any labor union for union benefits or welfare in reference to the premises, nor has Seller received any communications to appear at the State Labor Relations Board, except as listed herein, to wit:

39.     The Superintendent of the premises is paid a salary of $_____ per month, is a non-union member under Union Contract, and in addition to his salary, occupies _____ at the premises and receives free gas, electric (and telephone to the extent of $_____). No other or additional compensation is given. Seller further represents that the superintendent is not, nor has been, a tenant at the building and has never paid rent for the aforedescribed apartment. Any vacation pay or allowances to which the superintendent or any other help is entitled, by reason of past services, shall be adjusted at the closing computed from; if there be any pending negotiations with any union or with any service contract holder which may involve retroactive increases in pay or rates, the Seller is to reimburse the Purchaser for the amount thereof up to the closing date. Seller is to be responsible for pension and welfare payments to date of closing.

40.     That if there is an oil burner on the premises, all necessary permits and approvals, including a Certificate of Operation have been issued and are currently in effect, and the boiler or burner is in good operating condition and uses No. 4 or 2 oil.

41.     Seller will not remove any supplies or equipment now on the premises which are used in connection with the operation of the building.

42.     Seller represents that any covenants or restrictions to which Purchaser takes title do not provide for forfeiture or reverter, in the event of violation thereof, nor do they impose any restriction on alteration or demolition of any improvements on the premises.

43.     Seller will supply appropriate non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code as Amended, sufficient to provide an exemption under Subdivision (b) thereof, or if Seller is a foreign person under the terms of such Code, to comply with the provisions thereof.

44.     Seller represents that there are no pending harassment proceedings before any administrative agency or any court of competent jurisdiction, and that there have been no harassments filed against the property prior to two (2) years from the date of this Contract.

45.     Purchaser shall have reasonable access to the premises during the term of this Contract.

46.     Seller represents that if there is any bulk storage of petroleum at the subject premises, it will deliver an appropriate affidavit to that effect at the closing, or if one exists, Seller will deliver a Certificate of Registration of the oil storage tank from the D.E.C.

47.     Seller shall deliver at the time of closing all bills, cancelled checks and contracts for the installation of new windows, new boiler and new front doors.

48.     In the event seller has filed protests with relation to the assessed valuation of the property for tax purposes and instituted certiorari proceedings for reduction of such valuation and a reduction of taxes shall result, seller shall be entitled to collect refunds representing reductions for all years prior to and including the tax year, the year to be apportioned as of date of title closing. In the event of refund or remission of taxes, all expenses including legal fees shall first be deducted and the balance thereof shall be apportioned between the parties as of date of title closing and the purchaser shall pay its share thereof upon such refund or remission. This clause shall survive delivery of the deed.

49.     A reduction in the principal balance of the existing mortgage by payments of seller of regular installments due under said mortgage title shall be paid by purchaser to seller, in cash, at time of closing, as an adjustment and in addition to the purchase price herein.

50.     Any and all arrears due to the seller under the Maximum Base Rent Orders and/or Rent Stabilization Regulations shall be collected by the purchaser and paid to the Seller by the purchaser from the first rents collected by the purchaser from the respective tenants. Seller will furnish purchaser with a schedule of such arrears, if available, at closing of title.

14

51.   Any and all notices herein shall be made through the respective attorneys representing the seller and purchaser.

52.   The downpayment made hereunder shall be held in escrow by attorneys for seller(s), as Seller's agent (the "Escrow Agent") until (a) the closing of title at which time the escrow funds shall be disbursed to or on behalf of Seller without further authorization or (b) the cancellation of this contract in accordance with the terms hereof, in which event the downpayment shall be disbursed in accordance with the terms of this contract. Said downpayment will be deposited in the attorneys' trust which is an IOLA account (no interest credited to Seller or Purchaser).

The parties acknowledge and agree that the Escrow Agent is holding the escrow funds for the convenience of the parties and Seller and Purchaser agree to indemnify and hold the Escrow Agent harmless, except for its willful malfeasance, from any and all claims or damages, including, but not limited to, court costs, interest, losses and/or expenses, including legal fees, incurred by Escrow Agent as a result of the escrow.

It is agreed that the duties of the Escrow Agent are only such as are herein specifically provided, being purely ministerial in nature and that the Escrow Agent shall incur no liability whatever so long as the Escrow Agent has acted in good faith. The Escrow Agent shall not be required to defend any legal proceeding which may be instituted against the Escrow Agent with respect to the subject matter of the instructions contained herein and shall not be obligated to institute legal proceedings of any kind. The Escrow Agent assumes no liability except that of a stake holder. If there is any dispute as to whether the Escrow Agent is obligated to deliver the escrow fund or as to whom that fund is to be delivered, the Escrow Agent will not be obligated to make any delivery of the fund, but in such event may hold the fund until receipt by the Escrow Agent of an authorization, in writing, signed by all persons having an interest in such dispute or their attorneys directing the disposition of the sum or, in the absence of such authorization, the Escrow Agent may hold the sum until the final determination of the rights of the parties in an appropriate proceeding. Further, in the event a dispute shall arise as to the disposition of all or any portion of the escrow funds, the Escrow Agent, at its election, shall have the right to deposit the escrow funds with a court of competent jurisdiction and thereafter be discharged from any responsibility or liability as Escrow Agent.

PURCHASER(S):                                SELLER(S):

358 BROADWAY -
FRANKLIN ACQUISITION, LLC      358 BROADWAY LLC

By: _____                By: _____
    Member                            Member

15

**THIRD RIDER ANNEXED HERETO AND FORMING PART
OF CONTRACT OF SALE BETWEEN
358 BROADWAY LLC, AS SELLER, AND
358 BROADWAY-FRANKLIN ACQUISITION LLC
PURCHASER, AFFECTING
PREMISES LOCATED AT 358 BROADWAY
NEW YORK, NEW YORK**

Seller makes the following representations all of which shall be true, accurate and complete as of the date hereof and the closing date and shall survive closing for 1 year:

1. Exhibit "B" annexed hereto accurately sets forth all agreements (the "Leases") in force for the use, lease and occupancy of space at the Premises together with all modifications and amendments thereof. Except as set forth on Exhibit "B" all Leases are valid, enforceable and in full force and effect without default by Seller or Tenant, except the store lease to RJH Fashion Corp. ("RJH").

2. All rents under the Leases are legal rents and there are no arrearages in payment of rent or additional rent, except RJH.

3. No Tenant has paid rent for than one (1) month in advance and no Tenant has the right to or claimed the right to free rent, rent concessions, rebates, abatements or similar benefits and/or allowances except as set forth in rent roll.

4. No Tenant has claimed or asserted any defenses, counterclaims, set-offs or offsets against the rent.

5. Seller has no obligation to do any work under the Leases.

6. No renewal, extension or expansion options have been granted to any Tenant and no Tenant has any option, right of first refusal or other preferential right to purchase or lease the Premises or any part thereof.

7. There is no pending or threatened litigation or proceeding with respect to the ownership use and/or operation of the Premises, except for personal injury action entitled James Waitus v. 358 Broadway LLC, et al., pending in the Supreme Court, New York County, Index No. 1245361/02, being defended by Seller's insurance carrier.

8. There are no brokerage agreements, commissions, fees or the like with respect to the leases which have not been paid in full.

9. Annexed hereto as Exhibit "C" is a true and accurate list of all service and maintenance agreements affecting the Premises.

10. Annexed hereto as Exhibit "D" is a true and accurate list of all insurance carried by Seller which will be kept in full force and effect through closing.

11. Annexed hereto as Exhibit "E" is a true and complete list of all employees at the Premises and their full compensation and benefits. No employee is a union employee.

12. Annexed hereto as Exhibit "F" is a true copy of the permanent certificate of occupancy which will be in full force and effect on the closing.

13. There are no pending or contemplated condemnation proceedings.

14. Except set forth on annexed schedules, there exist no violations of laws affecting the Premises and Seller will comply with all laws, rules and regulations affecting the Premises between the date hereof and closing.

16

15.    Between the date hereof and closing, Seller shall maintain and keep the Premises, including mechanical equipment, in good condition and repair.

16.    There are no tax certiorari proceedings pending except as set forth on Exhibit "G" which will not be settled or compromised without the consent of Purchaser, which consent may not be unreasonably withheld or delayed.

17.    Between the date hereof and closing Seller shall operate and maintain the Premises in compliance with all applicable federal, state and municipal laws, rules and regulations.

18.    Seller will request any existing mortgage holder to assign its mortgage to Purchaser's mortgage lender at the closing.

19.    After May 15, 2005 Purchaser may record a memorandum of this Agreement provided that (1) Purchaser has delivered the second $1,000,000.00 downpayment to Seller's attorney and such deposit has cleared, and (2) prior to such filing Purchaser execute and deliver a Termination and Cancellation thereof in recordable form to Seller's attorney in escrow who may file same upon five (5) days' notice if Purchaser is in default of any of its obligations hereunder or if this Contract is terminated for any reason, except for Seller's willful default hereunder.

20.    Seller will deliver at closing tenant estoppel certificates in the form annexed hereto as Exhibit "H" from at least 65% of the tenants at the Premises dated no more than thirty (30) days prior to closing.  The other 35% shall be signed by Seller.

358 BROADWAY LLC

By: _____
    Jerry Jacobs, Member

Purchaser:

358 BROADWAY-FRANKLIN ACQUISITION LLC

By: _____
    Henry Kaufman, Member



### *First American Title Insurance Company of New York*

Title No. 3008-70953

## SCHEDULE "A"

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Broadway distant 117 feet 3 inches northerly from the corner formed by the intersection of the northerly side of Leonard Street and the easterly side of Broadway;

RUNNING THENCE easterly on a line which on its northerly side forms an angle of 89 degrees 49 minutes 50 seconds with the easterly side of Broadway, 175 feet 1 3/4 inches to a point on the westerly side of Benson Place distant 117 feet 5 inches northerly from the northwesterly corner of Leonard Street and Benson Place;

THENCE northerly along the westerly side of Benson Place 32 feet 4 1/4 inches to the rear line of said Benson Place;

THENCE easterly and along the said rear line of Benson Place 24 feet 8 3/4 inches to the easterly wall of the 5 story and basement brick building known as and by the street number 59 Franklin Street;

THENCE northerly along the said easterly face of said easterly wall of said building 51 feet 4 1/4 inches to the southerly side of Franklin Street;

THENCE westerly along the southerly side of Franklin Street, 84 feet 10 3/4 inches to a point in the easterly face of the easterly wall of the building on premises adjoining on the West known as and by the street number 67 Franklin Street;

THENCE southerly and along the said easterly face of the said easterly wall of said building 56 feet 1 inch to a point in the northerly face on the northerly wall of the building known as and by the street number 358 Broadway;

THENCE westerly and along the northerly face of said northerly wall of said building 115 feet 1/4 inch to the easterly side of Broadway;

THENCE southerly along the said easterly side of Broadway 28 feet to the point or place of BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

"B"

358 BROADWAY LLC
RENT ROLL REPORT
MARCH 2005

CONTACT:   ALAN ROSEN
           (212) 594-6066

59 FRANKLIN

| UNIT | TENANT | BASE RENT | GARBAGE REMOVAL | PASS ALONG | TOTAL RENT | SQ. FTGE. | TYPE | LEASE EXPIR. |
|---|---|---|---|---|---|---|---|---|
| B1 | WORLD BEAUTY | 1,273.00 | 0.00 | | 1,273.00 | 750 | CMML | 8/31/07? |
| B2 | SUGA INC. | 1,311.00 | 0.00 | | 1,311.00 | 600 | CMML | 12/31/05 |
| B3 | SUPER | SUPER | | | | 400 | | |
| B4 | GIGANTIC ART SPACE | 550.00 | 0.00 | | 550.00 | 500 | CMML | 12/31/12 |
| B5 | ORLY EVEN | 947.00 | 10.00 | | 957.00 | 750 | CMML | 5/31/05 |
| B6 | ART START | 600.00 | 0.00 | | 600.00 | 500 | CMML | 1/31/06 |
| B7 | WENDY NGUYEN | 470.00 | 0.00 | | 470.00 | 600 | CMML | 7/31/05 |
| B8 | B. VALENTA | 660.00 | 10.00 | | 670.00 | 400 | CMML | 5/31/05 |
| B9 | R. SCHALLER | 772.00 | 0.00 | | 772.00 | 650 | CMML | 5/31/05 |
| B10 | KEVIN AMER DARK ROOM | 936.00 | 15.00 | | 951.00 | 450 | CMML | 1/31/07 |

STORES

| UNIT | TENANT | BASE RENT | GARBAGE REMOVAL | PASS ALONG | TOTAL RENT | SQ. FTGE. | TYPE | LEASE EXPIR. |
|---|---|---|---|---|---|---|---|---|
| A | GIGANTIC BRAND | 2,700.00 | 0.00 | | 2,700.00 | 1,500 | CMML | 9/30/11 |
| B | GIGANTIC BRAND | 2,900.00 | 0.00 | | 2,900.00 | 1,450 | CMML | 12/31/12 |
| C | ISRAILOV | 1,875.00 | 0.00 | | 1,875.00 | 1,100 | STORE | 4/30/15 |
| D | GIGANTIC ART SPACE | 3,090.00 | 0.00 | | 3,090.00 | 2,300 | GALLERY | 12/31/12 |

STUDIOS

| UNIT | TENANT | BASE RENT | GARBAGE REMOVAL | PASS ALONG | TOTAL RENT | SQ. FTGE. | TYPE | LEASE EXPIR. |
|---|---|---|---|---|---|---|---|---|
| 1 | FREDDIE NG | 400.00 | 0.00 | | 400.00 | 400 | STUDIO | 6/30/05  8/31/06 |
| 2 | EDUARDO FAUSTI | 447.00 | 10.00 | | 457.00 | 350 | STUDIO | 12/31/05  7/31/06 |
| 3 | BEN-AMOTZ | 500.00 | 0.00 | | 500.00 | 350 | STUDIO | 12/31/05 |
| 4 | ANDRE HANDBAG | 430.00 | 10.00 | | 440.00 | 350 | STUDIO | 9/30/05 |
| 5 | NIGEL PARRY | 454.00 | 0.00 | | 454.00 | 350 | STUDIO | 1/31/06 |
| 6 | RI VAN NGUYEN | 550.00 | 0.00 | | 550.00 | 400 | STUDIO | 12/31/12 |
| 7 | GIGANTIC ART SPACE | 400.00 | 0.00 | | 400.00 | 400 | STUDIO | 12/31/12 |
| 7a | GIGANTIC BRAND LLC | 500.00 | 0.00 | | 500.00 | 350 | STUDIO | 8/14/05 |
| 8 | RAY GENTILE | 550.00 | 0.00 | | 550.00 | 325 | STUDIO | |

2ND FL

| UNIT | TENANT | BASE RENT | GARBAGE REMOVAL | PASS ALONG | TOTAL RENT | SQ. FTGE. | TYPE | LEASE EXPIR. |
|---|---|---|---|---|---|---|---|---|
| 201 | FRED IORIO | 1,064.00 | 0.00 | | 1,064.00 | 400 | CMML | 9/30/11 |
| 202 | PROJECT 59 | 1,040.00 | 0.00 | | 1,040.00 | 500 | CMML | 9/30/05 |
| 203 | FREDDIE NG | 482.00 | 10.00 | | 492.00 | 425 | CMML | 6/30/05 |
| 204 | OFFICE | MGMT | | | | 150 | | |
| 205/207 | P. WEISEL | 1,088.00 | 10.00 | | 1,098.00 | 500 | CMML | 5/31/05 |
| 206 | MGMT OFFICE | MGMT | | | | 250 | | |
| 208 | HAMPTON FILM | 1,269.00 | 15.00 | | 1,284.00 | 450 | CMML | 12/31/12  7/31/05 |
| 210 | GIGANTIC ART SPACE | 1,200.00 | 0.00 | | 1,200.00 | 400 | CMML | 12/31/12 |
| 212 | KIM LOUIE | 1,250.00 | 0.00 | | 1,250.00 | 450 | CMML | 5/31/06 |
| 214 | PARRY/DUNEA | 1,250.00 | 0.00 | | 1,250.00 | 450 | CMML | 9/30/06 |

## 59 FRANKLIN

| UNIT | TENANT | BASE RENT | GARBAGE REMOVAL | PASS ALONG | TOTAL RENT | SQ. FTGE | TYPE | LEASE EXPIR. |
|---|---|---|---|---|---|---|---|---|
| | 3RD FL | | | | | | | |
| 301 | JANE CREECH | 1,270.14 | 0.00 | 186.01 | 1,456.15 | 1,800 | RESIDENT | 1/31/07 |
| 302 | NINA CONOLLY | 1,081.08 | 0.00 | 163.38 | 1,244.46 | 2,050 | RESIDENT | 1/31/07 |
| 303 | WILLIAMS | 847.89 | 0.00 | 167.16 | 1,015.05 | 1,600 | RESIDENT | 1/31/07 |
| 306 | BURKEY/LYNN | 4,725.00 | 0.00 | | 4,725.00 | 2,250 | RESIDENT | 1/14/09 |
| | 4TH FL | | | | | | | |
| 4C1 | GIGANTIC MUSIC | 3,072.00 | 25.00 | | 3,097.00 | 700 | CMML | 12/31/12 |
| 4C2 | GIGANTIC MUSIC | 2,474.09 | 15.00 | | 2,489.09 | 1,100 | CMML | 12/31/12 |
| 4C3 | GIGANTIC MUSIC | 2,954.78 | 25.00 | | 2,979.78 | 2,500 | CMML | 12/31/12 |
| 4C4 | MARK DANN | 3,224.00 | 25.00 | | 3,249.00 | 2,500 | CMML | 4/14/10 |
| | 5TH FL | | | | | | | |
| 4A | LARRY CAMP | 898.54 | 0.00 | 163.35 | 1,061.92 | 2,456 | RESIDENT | 1/31/07 |
| 5R | NAIDICH SPACE LABS | 4,835.00 | 25.00 | | 4,860.00 | 2,650 | CMML | 7/31/06 |
| 5A | JULIA HEYWARD | 749.06 | 0.00 | 163.38 | 912.44 | 2,400 | RESIDENT | 1/31/07 |
| | 6TH FL | | | | | | | |
| 6B | E-COMMERCE | 4,529.00 | 0.00 | 188.89 | 4,697.89 | 2,240 | CMML | 11/30/13 |
| 6C | JOHN NEWMAN | 820.58 | 0.00 | 194.13 | 1,014.71 | 2,150 | RESIDENT | 1/31/07 |
| **358 BROADWAY** | | | | | | | | |
| STORE | RJH FASHION CORP. | 11,200.22 | 0.00 | | 11,200.22 | 5,000 | STORE | 9/30/10 |
| 2ND FL | BEN SCHNEEBERG | 1,098.26 | 0.00 | 145.03 | 1,243.29 | 3,400 | RESIDENT | 3/31/07 |
| 3RD FL | WEBSTER | 4,300.00 | 0.00 | | 4,300.00 | 2,700 | RESIDENT | 10/31/05 |
| 4TH FL | ERICA BECKMAN | 735.18 | 0.00 | 160.92 | 896.10 | 2,450 | RESIDENT | 1/31/07 |
| | 5TH FL | | | | | | | |
| 6D | VACANT | 4,725.00 | 0.00 | | 4,725.00 | 1,400 | RESIDENT | |
| 5A | BENJ LARICO | 820.57 | 0.00 | 172.19 | 992.76 | 2,800 | RESIDENT | 1/31/07 |
| | **TOTALS** | 85,318.30 | 205.00 | 1,684.47 | 87,207.77 | 63,346 | | |
| | **PER ANNUM** | | | | $1,046,493.24 | | | |

**358 BRODWAY LLC**
**LEASE EXPIRATIONS**
**2005**

| UNIT | NAME | EXPIRATION DATE | LEASE AMT @ EXPIRATION |
|------|------|-----------------|------------------------|
| B5 | ORLY EVEN | 5/31/05 | $947 |
| B8 | B. VALENTRA | 5/31/05 | $660 |
| B9 | R. SCHALLER | 5/31/05 | $772 |
| 205 | PAT WIESEL | 5/31/05 | $1,088 |
| STUDIO 1 | FREDDIE NG | 6/30/05 | XXXX |
| 203 | FREDDIE NG | 6/30/05 | $882 |
| B7 | WENDY NGUYEN | 7/31/05 | $470 |
| 208 | HAMPTON FILM FESTIVAL | 7/31/05 | $1,269 |
| STUDIO 8 | RAY GENTILE | 8/14/05 | $550 |
| 202 | LEVY | 9/30/05 | $1,040 |
| 3A | WEBSTER | 10/31/05 | $4,300 |
| B2 | SUGA INC. | 12/31/05 | $1,311 |

**358 BRODWAY LLC**
**LEASE EXPIRATIONS**
**2006**

| UNIT | NAME | EXPIRATION DATE | LEASE AMT @ EXPIRATION |
|------|------|-----------------|------------------------|
| B6 | ART START | 1/31/06 | $600 |
| STUDIO 6 | RI VAN NGUYEN | 1/31/06 | $550 |
| 212 | K. LOUIE | 5/31/06 | $1,250 |
| 5R | OXER (NAIDICH LAB) | 7/31/06 | $4,835 |
| STUDIO 2 | FAUSTI | 8/31/06 | $447 |
| 214 | PARRY/DUNEA | 9/30/06 | $1,250 |

**358 BROADWAY LLC**
SERVICE CONTRACTS
AS OF 3/20/05

**EXTERMINATING**
METRO PEST CONTROL
70-09 73RD PLACE
GLENDALE, NY 11385
(TEL) 718-803-0000

$230.29 PER MONTH
ONE YEAR CONTRACT EXPIRES 9/05

**ELEVATOR**
UNITED ELEVATOR CO.
13-02 44TH AVE
LIC, NY 11101

$1,144.97 PER QUARTER
ONE YEAR CONTRACT EXPIRES 9/05

Exhibit "D"

Schedule of Insurance

[Seller agrees to supply this exhibit to Purchase on or prior to April 11, 2005].

# 358 BROADWAY LLC
## EMPLOYEE
### AS OF 3/20/05

SUPER- LIVE OUT
"AT WILL EMPLOYEE"

DAREK KALINSKI
SS#: 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

WEEKLY PAY: $600

MEDICAL COST: $3,750 PER YEAR



THE CITY OF NEW YORK

# DEPARTMENT OF BUILDINGS
## CERTIFICATE OF OCCUPANCY

BOROUGH MANHATTAN          DATE: 1 2 2009    NO. 101094735

This certificate supersedes C. O. NO.                    ZONING DISTRICT C6-4

THIS CERTIFIES that the new—altered—existing—building—premises located at
59 FRANKLIN STREET                                Block 171    Lot 5

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN

### PERMISSIBLE USE AND OCCUPANCY

| AREA | LIVE LOAD LBS PER SQ FT | NO. OF DWELLING PERMITTED | ZONING DWELLING UNITS | BLDG CODE HABITABLE ROOMS | OCCUPANT LOAD | BUILDING CODE OCCUPANT GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| CELLAR | 0-C | 20 | | | | COMM | WHOLESALE + STORAGE + MANUFACTURING |
| BASEMENT | 100 | 20 | | | 67 | COMM | WHOLESALE + STORAGE |
| 1ST FLOOR | 100 | 40 | | | | COMM | WHOLESALE + STORAGE |
| | | | | | | COMM | ARTIST'S STUDIOS |
| | | | | | | COMM | OFFICE |
| | | | | | | COMM | MANUFACTURING |
| 2ND FLOOR | 100 | | 5 | 18 | | RES | FIVE (5) CLASS "A" APARTMENTS |
| 3RD FLOOR | 100 | | 1 | 12 | | RES | ONE (1) CLASS "A" APARTMENT |
| | 100 | 46 | | | | COMM | RECORDING STUDIO |
| | 6 | | | | | COMM | OFFICES |
| 4TH FLOOR | 100 | | 3 | 15 | | RES | THREE (3) CLASS "A" APARTMENTS |
| | 100 | 2 | | | | COMM | OFFICES |
| 5TH FLOOR | 100 | | 4 | 9 | | RES | FOUR (4) CLASS "A" APARTMENTS |
| | | THIRTEEN (13) CLASS "A" APARTMENTS MDL ARTICLE 7B OLD CODE | | | | | |

OPEN SPACE USES: .......

N.G.        NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE

_____  C.E.              _____  R.A.
                                   ACTING COMMISSIONER    M-S
                                   COMMISSIONER

☐ ORIGINAL    ☐ DUP. COPY - DEPARTMENT OF BUILDINGS    ☐ COPY

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS.

BEGINNING at a point on the _____ side of _____
street  SOUTH 56'-0"

| | EAST | | | BROADWAY |
|---|---|---|---|---|
| running thence | EAST 11°-1/4" | feet. | thence the corner formed by the intersection of FRANKLIN STREET | |
| | | | NORTH 56' | feet. |
| thence | EAST 85' | feet. | thence SOUTH 51'-4 1/4" | feet. |
| thence | WEST 24'-5 3/4" | feet. | thence SOUTH 32'-4 3/4" | feet. |
| thence | WE 3/4" | feet. | thence NORTH 25' | feet. |

to the point or place of beginning.

NEW ALT. NO.  101094735  DATE OF COMPLETION  9/15/00  CONSTRUCTION CLASSIFICATION  CLASS 3 NON-FIREPROOF

BUILDING OCCUPANCY GROUP CLASSIFICATION  RESIDENTIAL  HEIGHT  STORIES  8  FEET  65'-0"

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | A. AUTOMATIC SPRINKLER SYSTEM | | X | |
| YARD HYDRANT SYSTEM | | | | | | |
| STANDPIPE-FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | | |
| SMOKE DETECTION | | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | | |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER ☐   B) COMBINED SEWER ☐   C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐   B) COMBINED SEWER ☐   C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS:
BOARD OF STANDARDS AND APPEALS CAL. NO. _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:

**358 Broadway LLC**
**358 Broadway**
**New York, New York**


      Brill & Meisel has filed tax certiorari petitions for 358 Broadway LLC, owner of the
property located at 358 Broadway (block 171, lot 5), New York, New York, for the tax years
2001/02, 2002/03, 2003/04 and 2004/05 with the Supreme Court of the State of New York.
These petitions, requesting reductions in the real estate assessments for 358 Broadway,
remain open.

f:\se\358-213-.se

# EXHIBIT " _H_ "

## TENANT ESTOPPEL CERTIFICATE

_____, 2005

_____
_____
_____

Re: Property known as _____, New York, New York (the "Premises");
Lease dated _____ between _____(hereinafter, "Landlord")
and _____ (hereinafter, "Tenant") (as the same may have been
modified, amended, supplemented or assigned, the "Lease")

Dear Sirs/Madames:

Tenant, as a tenant in the Premises pursuant to the Lease, hereby certifies to you as follows:

1. The Lease includes the modifications, amendments, supplements and assignments listed below and no other documents, and is in full force and effect as of the date hereof:

2. All conditions under the Lease to be performed by Landlord have been satisfied and all required contributions by Landlord, if any, to Tenant on account of Tenant's improvements have been received.

3. The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing of the demised premises described therein.

4. ~~The term of the lease is _____ and~~ Tenant has accepted the demised premises and has taken full possession and occupancy.

5. As of the date hereof, there are no existing defenses or offsets which Tenant has against the enforcement of the Lease by Landlord, there exist no defaults under the Lease and Tenant has no knowledge of the existence of any event which, with the giving of notice, the passage of time or both, would constitute such a default.

6. Tenant is not entitled to any credits, offsets, abatements or deductions against or in respect of the rent payable under the Lease. There are no free rent periods or other concessions under the Lease.

F:\IDA\DOCUMENT\TENANT ESTOPPEL CERTIFICATE.wpd

7. The amount of the security deposit presently held by Landlord under the Lease is $_____. *The Lease is subject and subordinate to all mortgages.*

8. The fixed rent payable under the Lease is $_____ per annum, payable monthly in advance, and such fixed rent has been paid through _____, 2005. ~~No rent has been paid more than thirty (30) days in advance of the due date thereof.~~

9. ~~The Lease provides for the following rent escalations or additional percentage or other rents or payments, all of which have been paid by Tenant to the date hereof.~~

10. The Lease expires on _____ and the Lease provides for ~~the following~~ renewal options *NO*

11. ~~There are no actions or proceedings, whether voluntary or involuntary, pending against Tenant under the bankruptcy or insolvency laws of the United States of America or any state thereof.~~

12. This certificate may be relied upon by you and your successors and assigns and any mortgagee or prospective mortgagee of the Premises.

Very truly yours,

_____

By: _____

Name:
Title:

F:\IDA\DOCUMENT\TENANT ESTOPPEL CERTIFICATE.wpd

# FIRST AMENDMENT TO CONTRACT SALE DATED APRIL 4, 2005 BETWEEN 358 BROADWAY LLC AS SELLER AND 358 BROADWAY-FRANKLIN ACQUISITION, LLC AS PURCHASER

## RECITALS

A.  358 Broadway LLC ("Seller") and 358 Broadway-Franklin Acquisition LLC ("Purchaser") entered into Contract of Sale dated April 4, 2005 (the "Contract").

B.  Purchaser and Seller wish to make certain modifications to the Contract.

NOW, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Paragraph 23 of the Contract is hereby deleted in its entirety and replaced with the following:

23.  **Due Diligence Period:** Purchaser shall be afforded a period through June 13, 2005 ("Due Diligence Period"), to inspect the Premises and all filings and reports with respect thereto. At any time during the Due Diligence Period, Purchaser shall have the right to cancel this Contract upon written notice ("Cancellation Notice") and to receive a refund of a portion of the Initial Downpayment as set forth below. In the event Purchaser elects to cancel this Contract during the Due Diligence Period or if Purchaser does not give Seller written notice of its intention to go forward with this Contract (a "Waiver Notice") and does not deliver to Seller's attorney the second $1,000,000 downpayment, Purchaser shall be deemed to have terminated this Contract and Seller's sole obligation shall be to refund a portion of the Initial Downpayment to Purchaser as set forth below, after which this Contract will be deemed null and void and of no further force and effect. Notwithstanding anything contained herein to the contrary, (a) if Purchaser delivers a Cancellation Notice on or before May 31, 2005, $950,000 of the Initial Downpayment shall be returned to Purchaser and $50,0000 of the Initial Downpayment shall be delivered to Seller as a payment for its agreement to this Contract Amendment, (b) if Purchaser shall deliver a Cancellation Notice after May 31, 2005 but on or before June 13, 2005, $900,000 of the Initial Downpayment shall be returned to Purchaser and $100,0000 of the Initial Downpayment shall be delivered to Seller as a payment for its agreement to this Contract Amendment and (c) if Purchaser shall not deliver (i) a Waiver Notice to Seller and (ii) the second $1,000,000 downpayment to Seller's attorney by the expiration of the Due Diligence Period, $900,000 of the Initial Downpayment shall be returned to Purchaser and $100,0000 of the Initial Downpayment shall be delivered to Seller as a payment for its agreement to this Contract Amendment.

C:\Documents and Settings\Mark\Local Settings\Temporary Internet Files\Content.IE5\ZZKV9SIS\amsmany-amendment[2].wpd

2.      Except as modified hereby, the Contract is unchanged and shall remain in full force and effect.

3.      This First Amendment of Contract of Sale may be executed in counterparts and facsimile counterparts hereof shall be effective for all puposes.

**IN WITNESS WHEREOF**, the parties hereto have set their hands to this First Amendment of Contract of Sale as of the _13th_ day of May, 2005.

SELLER:

358 BROADWAY LLC

By: _____

PURCHASER:

358 BROADWAY-FRANKLIN ACQUISITION, LLC

By: _____

2.  Except as modified hereby, the Contract is unchanged and shall remain in full force and effect.

3.  This First Amendment of Contract of Sale may be executed in counterparts and facsimile counterparts hereof shall be effective for all purposes.

**IN WITNESS WHEREOF**, the parties hereto have set their hands to this First Amendment of Contract of Sale as of the __13__ day of May, 2005.

SELLER:

358 BROADWAY LLC

By: _____

PURCHASER:

358 BROADWAY-FRANKLIN ACQUISITION, LLC

By: _____

**SECOND AMENDMENT TO CONTRACT SALE DATED APRIL 4, 2005 BETWEEN 358 BROADWAY LLC AS SELLER AND 358 BROADWAY-FRANKLIN ACQUISITION, LLC AS PURCHASER**

**RECITALS**

A.  358 Broadway LLC ("Seller") and 358 Broadway-Franklin Acquisition LLC ("Purchaser") entered into Contract of Sale dated April 4, 2005 (as amended by First Amendment to Contract, the "Contract").

B.  Purchaser and Seller wish to make certain modifications to the Contract.

   **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Paragraph 23 of the Contract is hereby deleted in its entirety and replaced with the following:

   23.   **Due Diligence Period**: Purchaser shall be afforded a period through July 11, 2005 ("Due Diligence Period"), to inspect the Premises and all filings and reports with respect thereto.  At any time during the Due Diligence Period, Purchaser shall have the right to cancel this Contract upon written notice ("Cancellation Notice") and to receive a refund of a portion of the Initial Downpayment as set forth below.  In the event Purchaser elects to cancel this Contract during the Due Diligence Period or if Purchaser does not give Seller written notice of its intention to go forward with this Contract (a "Waiver Notice") and does not deliver to Seller's attorney the second $1,000,000 downpayment, Purchaser shall be deemed to have terminated this Contract and Seller's sole obligation shall be to refund a portion of the Initial Downpayment to Purchaser as set forth below, after which this Contract will be deemed null and void and of no further force and effect.  Notwithstanding anything contained herein to the contrary, until such time as a Waiver Notice and the second $1,000,000.00 downpayment have been delivered:

   (a)                 if Purchaser delivers a Cancellation Notice on or before June 13, 2005, $900,000 of the Initial Downpayment shall be returned to Purchaser and $100,0000 of the Initial Downpayment shall be delivered to Seller as a payment for its agreement to enter into this Second Amendment to Contract of Sale;

   (b)                 if Purchaser has not delivered a Cancellation Notice by June 13, 2005, Escrow Agent is authorized and directed to deliver to Seller the sum of $100,000.00 from the Initial Downpayment.;

(c)          if Purchaser shall deliver a Cancellation Notice after June 13, 2005 but on or before June 27, 2005, a portion of the balance of the Initial Downpayment in the amount of $50,000.00 shall be delivered to Seller and the balance of $850,000.00 shall be returned to Purchaser;

(d)          if Purchaser has not delivered a Cancellation Notice by June 27, 2005, Escrow Agent is authorized and directed to deliver to Seller the sum of $50,000.00 from the Initial Downpayment, as previously reduced;

(e)          if Purchaser shall deliver a Cancellation Notice after June 27, 2005 but on or before July 11, 2005, a portion of the balance of the Initial Downpayment in the amount of $50,000.00 shall be delivered to Seller and the balance of $800,000.00 shall be returned to Purchaser; and

(f)          if Purchaser shall not deliver (i) a Waiver Notice to Seller and (ii) the second $1,000,000 downpayment to Seller's attorney by the expiration of the Due Diligence Period, a portion of the balance of the Initial Downpayment in the amount of $50,000.00 shall be delivered to Seller and the balance of $800,000.00 shall be returned to Purchaser.

2.          At Closing,      (X) if Purchaser has delivered a Waiver Notice and the second $1,000,000 Downpayment on or before June 27, 2005, the reference to "$2,000,000.00" in line (a) of Schedule C to the Contract shall be deemed to be replaced with "$1,950,000.00" and the reference to "$15,500,000.00" in line (b) of Schedule C to the Contract shall be deemed to be replaced with "$15,550,000.00" and (Y) if Purchaser has delivered a Waiver Notice and the second $1,000,000 Downpayment after June 27, 2005 but on or before July 11, 2005, the reference to "$2,000,000.00" in line (a) of Schedule C to the Contract shall be deemed to be replaced with "$1,900,000.00" and the reference to "$15,500,000.00" in line (b) of Schedule C to the Contract shall be deemed to be replaced with "$15,600,000.00".

3.          In the event that Purchaser shall deliver a Waiver Notice and the second $1,000,000.00 Downpayment, Purchaser and Seller agree to execute and deliver to each other a letter confirming the date upon which such deliveries were made and the deemed amounts of lines (a) and (b) of Schedule C to the Contract.

4.          By his signature below, Jerry Jacobs, a principal of Seller, guarantees payment to Purchaser of those portions of the Initial Downpayment released to Seller hereunder, under those circumstances pursuant to which Purchaser is entitled to a return of the Downpayment under this Contract other than pursuant to Paragraph 23 of the Contract.

5.      Except as modified hereby, the Contract is unchanged and shall remain in full force and effect.

6.      This Second Amendment of Contract of Sale may be executed in counterparts and facsimile counterparts hereof shall be effective for all purposes.

   **IN WITNESS WHEREOF**, the parties hereto have set their hands to this Second Amendment of Contract of Sale as of the 10th day of June, 2005.

**SELLER:**

**358 BROADWAY LLC**


By: _____
   Terry Jacobs, Member

**PURCHASER:**

**358 BROADWAY-FRANKLIN ACQUISITION, LLC**


By: _____


**PAYMENT OF RELEASED PORTIONS OF INITIAL DOWNPAYMENT
TO PURCHASER GUARANTEED PURSUANT TO PARAGRAPH 4 ABOVE:**


_____
Jerry Jacobs

### THIRD AMENDMENT TO CONTRACT OF SALE
### DATED APRIL 4, 2005 BY AND BETWEEN
### 358 BROADWAY, LLC ("SELLER")
### AND 358 BROADWAY-FRANKLIN ACQUISITION, LLC ("PURCHASER")

WHEREAS, Seller and Purchaser entered into an Agreement dated April 4, 2005 with respect to the sale of premises located at 358 Broadway a/k/a 59 Franklin Street, New York, New York ("Premises"), as amended by a First Amendment to the Contract of Sale dated May 13, 2005 and a Second Amendment to the Contract of Sale dated June 10, 2005 (collectively, "Contract"):

WHEREAS, Purchaser and Seller wish to make certain further modifications to the Contract.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the parties hereby agree as follows:

1.      Paragraph 25(d) of the Contract is hereby amended by deleting the second sentence thereof and replacing same with the following: "Seller will cooperate with Purchaser to obtain surrender agreements relating to the possession of portions of the Premises presently occupied by commercial tenants by making introductions and facilitating discussions between Purchaser and its representatives with representatives of the various commercial tenants from time to time."

2.      Escrow Agent is hereby specifically directed and authorized to release the sum of $250,000.00 from the Downpayment and pay same to Seller upon the execution of this Agreement. Said sum shall no longer be required to be held in escrow for the benefit of the parties pursuant to the terms of the Contract. Additionally, if Escrow Agent is notified to do so in writing by Purchaser in accordance with the terms of the Contract, Escrow Agent is hereby specifically directed and authorized to release the additional sums of $250,000.00 each from the Downpayment and pay same to Seller on August 23, 2006 and

November 23, 2006, which sums also shall no longer be required to be held in escrow by Escrow Agent for the benefit of the parties pursuant to the terms of the Contract. Additionally, if Escrow Agent is notified to do so in writing by Purchaser in accordance with the terms of the Contract, Escrow Agent is hereby specifically directed and authorized to release to Seller the additional sum of $300,000.00 on February 23, 2007 which sum also shall no longer be required to be held by Escrow Agent for the benefit of the parties pursuant to the terms of the Contract.

Purchaser and Seller hereby each jointly and severally indemnify and hold Escrow Agent harmless for any release(s) of any portion(s) of the Downpayment to Seller made in conformity with the terms of this Paragraph 2 of this Third Amendment to the Contract.

3.      In addition to any sums due under the Contract and not in lieu thereof, Purchaser agrees to pay to Seller the sum of $25,000.00 and Purchaser shall pay to Seller's attorneys, Brill & Meisel, the sum of $1,000.00 simultaneously with the execution of this Third Amendment to the Contract. Additionally, Purchaser agrees in its sole discretion to make additional monthly payments of $10,000.00 each and every month to Seller on the 22nd day of each month commencing June 22, 2006 and terminating October 22, 2006 which additional payments shall not be considered a portion of the Price and shall not credited against same or any portion thereof.

4.      Paragraph 25(c) of the Contract is hereby amended to replace the words "ten (10) days" with "five (5) days" in the first line of the first sentence thereof and by adding the following sentence at the conclusion of the first sentence of the first paragraph thereof: "Any such payment not made within said five (5) days of the due date thereof and after the transmittal of a bill therefor, shall be subject to a penalty of two (2%) per cent per month for each month or any portion thereof in which said amount remains unpaid which penalty, together with the amount of said bill, shall be due and owing from Purchaser to Seller."

-2-

5.    Except as modified herein, all of the terms and conditions of the Contract remain in full force and effect. All capitalized terms herein shall have the exact same meaning as in the Contract.

Dated: New York, New York
       May  23, 2006

SELLER:

358 BROADWAY, LLC

By: _____
                      Manager

PURCHASER:

358 BROADWAY—FRANKLIN LLC

By: _____
                      Manager

-3-

# ASSIGNMENT OF CONTRACT

THIS ASSIGNMENT OF CONTRACT ("Assignment") made this 30th day of April, 2007, between 358 BROADWAY LLC ("Assignor"), to Joel Rosen, Mark Bortnick, Mitchell Penberg, Robert J. Rosen and Alan I. Rosen ("Assignee").

Assignor assigns its rights under a certain Contract of Sale dated April 4th 2005, as amended ("the Contract") by and between 358 BROADWAY LLC, as Seller and 358 BROADWAY-FRANKLIN ACQUISITION, LLC, as purchaser, for the sale of 358 Broadwaya/k/a 59 Franklyn Street, New York, New York ("Premises"), its rights to sell a 10% undivided interest to Joel Rosen, a 5% undivided interest to Mark Bortnick, a 5% undivided interest to Mitchell Penberg, a 1.25% undivided interest to Robert J. Rosen, and a 1.25% undivided interest to Alan I. Rosen.

Assignor retains holds a 77.50% undivided interest in the Premises and the Contract.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment as of the date first above written.

358 BROADWAY LLC, Assignor

By: _____
Joel Rosen, Manager

_____
Joel Rosen, Assignee

Mark Bortnick, Assignee

By: _____
Joel Rosen, his attorney- in- fact

Mitchell Penberg, Assignee

By: _____
Joel Rosen, his attorney- in- fact

Robert J. Rosen, Assignee

By: _____
Joel Rosen, his attorney- in- fact

_____
Alan I. Rosen, Assignee

G:/358Bway/assign of K.cst